IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| SARAH ELIZABETH BUTTERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:15-cv-00015 |
| | ) | |
| JAMES MADISON UNIVERSITY, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

In this action, plaintiff Sarah Butters brings a claim against James Madison University (JMU) under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681(a), which prohibits certain educational institutions from discriminating in specific ways "on the basis of sex."[1] Her complaint alleges that, while she was enrolled as a student at JMU and on spring break in Florida in March 2013, she was sexually assaulted by three male JMU students. One of those students made a video recording of at least a portion of the assault using his cell phone camera. The recording was subsequently disseminated to other JMU students. As discussed in more detail below, Butters alleges that she complained to JMU about both the assault and the continued dissemination of the recording, and that JMU failed to redress the situation adequately.

JMU has moved to dismiss the complaint, arguing that its response to Butters's complaints was sufficient to avoid liability under Title IX. In particular, JMU emphasizes that

---

[1] The statute provides that, with certain exceptions not relevant here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a).

although Butters first made JMU officials aware of the assault and dissemination of the recording a few weeks after the incident, she elected not to initiate a formal complaint at that time. JMU further relies on the allegations that, once she filed a formal complaint in January 2014, the school undertook an investigation, conducted disciplinary proceedings, found that the assault had occurred, and ultimately imposed sanctions on all three men involved, including expulsion following graduation. JMU thus argues that Butters has failed to state a claim upon which relief can be granted.

The court heard oral argument on the motion, and it is now ripe for disposition. For the reasons set forth below, the motion will be denied.

## I. BACKGROUND

The court accepts the well-pleaded, nonconclusory factual allegations in the complaint as true when ruling on a motion to dismiss. *Aziz v. Alcolac, Inc.*, 658 F.3d 388, 391 (4th Cir. 2011); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). According to the complaint, Butters was a student at JMU from August 2010 through her withdrawal from the University on May 30, 2014, and was a member of a sorority on campus. (Dkt. No. 2, Compl. ¶¶ 6, 18.) In March 2013, during her third year at JMU, Butters joined a large group of JMU students in Panama City, Florida, for spring break. (*Id.* ¶ 19.)

On Sunday, March 3, 2013, the day after her arrival, Butters and a large group of JMU students—the "vast majority" of whom were members of various fraternities and sororities on campus—convened on the beach in front of the complex where Butters was staying with friends. (*Id.* ¶¶ 19–21.) Butters "consumed alcohol, had very little to eat, and spent the majority of the day under the hot sun. By the afternoon, she was visibly intoxicated." (*Id.* ¶ 22.)

She returned to her condominium complex and was invited to the condominium of three

2

fellow JMU students—Jay Kyler Dertzbaugh, Michael Joseph Lunney Jr., and Nicholas John Scallion—all of whom were members of the Sigma Chi fraternity. (*Id.* ¶¶ 23–24.) The three men later "cornered" her in the bathroom of their condominium, "removed her bathing suit top, and took turns groping and fondling her bare breasts." (*Id.* ¶ 25.) She alleges that one or more of the men attempted to remove her bathing suit bottom, that her bathing suit top was taken from her, and that one or more of the men stopped her in her attempts to put it back on. (*Id.*) One of the men "forcibly pulled Ms. Butters onto his lap, as he fondled her exposed breasts." (*Id.*) At least one of the three men also made a video recording of the assault using his cell phone. (*Id.* ¶ 27; *see* Dkt. No. 2-1, sealed copy of recording.)

The complaint further alleges that, throughout the duration of the assault, Butters repeatedly told the men that their behavior "was not alright [sic]," requested that they "stop," and said "no." She was visibly intoxicated, unsteady on her feet, and her words were slurred. She did not consent, nor was she capable of consenting to any of the sexual activity that occurred in the bathroom. (Dkt. No. 2, ¶ 26; Dkt. No. 2-1.)[2]

During the remainder of the spring break week, "rumors of the video began to circulate amongst the [JMU] student population present in Panama City, Florida." (*Id.* ¶ 29.) When Butters confronted Dertzbaugh about the sexual assault and the recording, he denied both. (*Id.*)

After the students returned to campus from spring break, the video of the sexual assault of Butters circulated "throughout the [JMU] community and, in particular, throughout the

---

[2] The complaint also alleges that Butters was so "heavily intoxicated" that "she has no direct memory of the event." (Dkt. No. 2, Compl. ¶ 28.) Presumably, then, the complaint's description of the assault did not come from Butters's own memory. It is possible, of course, that the allegations are based on the testimony of the three men from one or more of the disciplinary proceedings. To the extent that the description is based solely on the recording provided as an exhibit, however, the court notes that both the video and audio quality of the sealed recording are poor, and it is difficult to discern much of what is said. The recording does not depict all of the facts alleged in the complaint, either. Nonetheless, for purposes of the motion to dismiss, the court credits the complaint's allegations as true.

3

membership of the University's various fraternities and sororities." (*Id.* ¶ 30.) One of the men, Scallion, texted Butters denying the existence of the video and offering a general apology for the "disrespect" and "drunken stupidity." (*Id.* ¶ 33.) Within a week, Butters became aware that the video was circulating and "was tremendously concerned, embarrassed[,] and confused about what steps should be taken." (*Id.* ¶ 32.)

On March 27, 2013, Butters decided she needed assistance in handling the situation, and she contacted the president of her sorority, the president of Sigma Chi fraternity, and Paula Polglase, who was the JMU employee serving as the advisor to Butters's sorority. (*Id.* ¶ 34.)[3] The fraternity president responded immediately and asked to meet with Butters. (*Id.* ¶ 35.) After doing so and seeing the video, he expelled all three men from the fraternity and banned them from any further participation in any fraternity events. (*Id.*)

On April 12, 2013, Butters and Polglase met with Wendy Young, who was then the Associate Director of Judicial Affairs. (*Id.* ¶ 36.) Butters conveyed to Young "in graphic detail" what the three men had done and further explained that the acts were not consensual. She also explained that the video was being widely disseminated among JMU students and described "the negative interactions, comments and pressure that she was receiving from her peers who had seen the video or were otherwise aware of the assault." (*Id.* ¶ 37.) Butters now complains that Young, before even viewing the video, tried to discourage her from filing a complaint by describing a process that was time-consuming, would involve reliving the event multiple times, and would require significant time and effort from her. (*Id.* ¶ 39.) Young also explained that a variety of sanctions were available, but told Butters that expulsion was very rare and highly unlikely in light of the circumstances she described. (*Id.* ¶ 40.)

---

[3] At the time, Polglase was employed by JMU as its Assistant Director of Alumni Relations. (Dkt. No. 2, ¶ 18.)

4

Butters gave Young the video and asked if JMU could address the matter, including the assault and the video's dissemination, without her involvement. (*Id.* ¶ 42.) Young responded that "JMU would neither investigate nor act upon the matter independently." (*Id.*) Butters decided not to pursue a formal complaint at that time. (*Id.* ¶ 43.) She was given the name and contact information for a counselor, and she sought counseling. (*Id.* ¶ 44.)

Butters alleges that the three men remained on campus and, other than being expelled from their fraternity, participated fully in campus life, "while dissemination of the video continued unchecked." (*Id.* ¶ 45.) The last day of classes for that semester was two weeks later, April 26, 2013. (*Id.* ¶ 46.)

At some point after that date and before December 2013, Young sent Butters an email asking if she had decided how she would like to proceed and "asking if Butters was alright [sic]." (*Id.* ¶ 46.) Butters states that, during this period, she "struggled both socially and academically," and that the video of her assault and its circumstances "came to define her identity on campus." (*Id.* ¶ 48.) She further alleges that she "encountered the perpetrators of the assault regularly, despite her efforts to avoid activities where potential encounters with them were likely." (*Id.*) She also alleges that she "continued to be sexually harassed and further victimized as the video of her assault was widely disseminated." (*Id.* ¶ 47.) Although she does not reference any particular incidents, she states that people frequently asked her about the assault and that some students "expressed the opinion that it was her fault for having been intoxicated." (*Id.* ¶ 48.) She eventually stopped attending classes and failed all of her courses. (*Id.*)

In November 2013, Butters's father, William Butters, sent a lengthy email to Dr. Mark J. Warner, JMU's Vice-President of Student Affairs, inquiring about the handling of Butters's claim. The email ultimately was referred to Dr. Josh Bacon, the Director of the Office of Student

5

Accountability and Restorative Practices, who is responsible for oversight of JMU's process for addressing allegations of sexual misconduct. (*Id.* ¶¶ 11, 50.) In response, JMU reiterated that, for it to proceed with its process for addressing such complaints, Butters would need to initiate formally the process outlined by Young. (*Id.* ¶¶ 49–51.) At some point during the course of Mr. Butters's communications with JMU personnel, Dr. Bacon commented that he believed the acts depicted in the video were consensual. (*Id.* ¶ 51.) This comment "reinforced the perception" of Butters and her father that JMU was "not interested in imposing any legitimate sanctions . . . ." (*Id.*)

On December 17, 2013, Butters was informed that JMU revoked her financial aid because she had failing grades in all five of her fall semester classes. (*Id.* ¶ 52.) On January 10, 2014, Butters signed the paperwork formalizing her desire to proceed with the charges against all three men and also provided a document containing a detailed account of the assault, the dissemination of the video, and communications with other students about the incident. (*Id.* ¶¶ 53-54.) She also testified at three separate hearings in February 2014 (one for each of the three men). (*Id.* ¶¶ 55–56.) The result of the hearings was that all three men were found to be responsible for sexual assault and sexual harassment. (*Id.* ¶ 56.)

Before announcing the punishment to be imposed, Dr. Bacon met with Butters and advised her that he was contemplating a punishment of "expulsion after graduation." (*Id.* ¶ 57.) She believed he was indifferent to "her victimization" and motivated to "conclude the matter as quickly and quietly, with as little negative publicity to the University as possible." (*Id.* ¶¶ 57–59.) She also believed he was "testing" her response, "so that he could weigh how much it would appease her should it be ultimately imposed." (*Id.* ¶ 58.)

Butters wept upon hearing the proposed punishment, and later emailed Dr. Bacon stating

6

her belief that the proposed punishment of "expulsion following graduation" was inadequate. (*Id.* ¶ 59.) Nonetheless, that was the punishment that JMU imposed, along with a no-contact provision and other, less severe penalties. (*Id.* ¶ 62.) As explained by Dr. Bacon, "there was no protocol in place to ensure that the three men did not return to campus following graduation," but if Butters observed them on campus, she could notify the campus police. (*Id.* ¶ 62.) As for the no-contact provision, Butters likewise was told that if the men contacted her, she would have to call the police. (*Id.*)

Butters appealed the sanction imposed and had to testify live at an appeals hearing. (*Id.* ¶ 64.) At the conclusion of her appeal, all three men were formally expelled from JMU. (*Id.* ¶ 65.) Thereafter, however, they appealed and had their second hearings at the appellate level. (*Id.* ¶¶ 65–66.) Again, Butters testified. (*Id.* ¶ 66.)

At the conclusion of those appeals, the punishment of expulsion after graduation was reinstated in April 2014. (*Id.* ¶ 68.) That meant (as applied to Lunney and Scallion) that they were not permitted on campus for any reason after graduation, could not participate in student clubs or organizations, and could not walk at graduation. (*Id.* ¶ 69.) As to Dertzbaugh, he would be permitted to remain actively enrolled as a student until his graduation. (*Id.* ¶ 71.) All three were also barred from having any contact with Butters and required to create a 30-minute presentation on sexual assault for possible presentation to student organizations. (*Id.* ¶ 69.)

Butters faults JMU's procedures for handling sexual assaults, alleging that "[t]he convoluted structure employed by [JMU] to adjudicate complaints of sexual assault between students operated in lieu of any fixed rules, guidelines[,] or actions, once responsibility for sexual assault and sexual harassment was determined." (*Id.* ¶ 67.) She further alleges that "[t]he lack of fixed protocol or procedure regarding punishment for student-on-student sexual assault

7

and harassment served to re-victimize Ms. Butters repeatedly and unduly lengthened her ordeal." (*Id.*)

She also alleges, in general terms, that JMU has failed to take sexual assault complaints seriously, has not provided victims of assault "with the proper resources and support," and "[has] trivialized the seriousness of sexual assault and harassment by rendering grossly disproportionate and egregiously inadequate penalties, even when the misconduct is clearly proven and the guilt of the wrongdoer obvious." (*Id*. ¶ 76.) Butters summarizes that JMU's actions "denied [her] full and free access to the educational, social, recreational, and personal benefits and opportunities afforded by the University." (*Id.* ¶ 75.)

## II.  DISCUSSION

A.  **Rule 12(b)(6) Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, *i.e.*, the 'plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678). The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

In determining whether the plaintiff has met this plausibility standard, the court must take as true all well-pleaded facts in the complaint and in any documents incorporated into or attached to the complaint. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it need

8

not "accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).

**B.      The Court Will Consider the Two Exhibits Attached to JMU's Motion to Dismiss.**

Before turning to the merits of JMU's motion to dismiss, the court must first determine which documents and other extrinsic materials the court may consider in ruling on the motion to dismiss. Clearly, the court may consider the sealed video attached to the complaint without converting the motion to dismiss into a summary judgment motion. *Cf.* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." (citing *Sec'y of State for Defence*, 484 F.3d at 705)).

The court may also consider a document outside the complaint if it "was integral to and explicitly relied on in the complaint," and there is no authenticity challenge. *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448 (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)); *Sec'y of State for Defence*, 484 F.3d at 705. JMU relies on this principle in asking the court to consider the documents attached as Exhibits A and B to JMU's motion to dismiss.[4]

Exhibit A contains two documents that JMU states are referenced in the complaint, *i.e.*, its policies concerning the reporting and process for investigating and handling allegations of sexual assault. (Dkt. No. 10, Def.'s Br. in Supp. of Mot. to Dismiss 11; Dkt. No. 10-1, Ex. A.) The first is titled "Spring 2014 Rights, Procedures, and Policy" (Dkt. No. 10-1 at 1–9) and the second is titled "Spring 2013 Rights, Procedures, and Policy" (*id.* at 10–18). JMU also asks the

---

[4] Butters has not challenged the authenticity of either exhibit.

9

Case 5:15-cv-00015-EKD-JCH   Document 42   Filed 11/06/15   Page 9 of 17   Pageid#: 326

court to consider Exhibit B, which is an email from Young to Butters, describing the punishment that would be imposed on the three men who were found guilty of sexually assaulting her.

Butters counters that it would not be appropriate for the court to consider these additional documents in ruling on the motion to dismiss. (Dkt. No. 18, Pl.'s Br. in Opp'n to Def.'s Mot. to Dismiss 1–2). Stated simply, she argues that there are only certain "limited, narrowly circumscribed exceptions" in which a court may consider such an outside document—such as where the document forms the basis for a contract claim—and that none of those exceptions apply here. (*Id.* at 5–6.)

The court concludes that it is appropriate to consider both exhibits in ruling on the motion to dismiss, but notes that it would have reached the same result here even if it had not considered either. As to Exhibit A (the two policies), Butters specifically alleges that "the policy and protocol for handling complaints of sexual assault and harassment between students, as explained by Ms. Young, had the chilling effect of silencing Ms. Butters and dissuading her from making a formal complaint." (Dkt. No. 2, ¶ 43.) Thus, her complaint does rely on JMU's policies as the reason why she did not file a formal complaint, a fact that is significant in the case and important to her allegations. Accordingly, the court concludes that it may consider Exhibit A when ruling on the motion to dismiss. *See Baker v. McCall*, 842 F. Supp. 2d 938, 943 (W.D. Va. 2012) (considering, when ruling on a motion to dismiss, a school system's written nepotism policy where the plaintiff's complaint referred to the policy, it was "central to plaintiff's claim," and its authenticity was not disputed).[5]

---

[5] To the extent JMU relies on Exhibit A to show that the information Young provided to Butters about the difficulty of the complaint process was accurate and consistent with its policies, compliance with its policy does not automatically absolve JMU of liability. Put differently, whether JMU's administrators were "deliberately indifferent" will not turn on whether they complied with their own policies. *Cf. Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 657 (D. Md. 2013) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S.

Like Exhibit A, Exhibit B (Young's email) does not contradict any allegation in Butters's complaint. Instead, it simply confirms what the punishment was determined to be for the three students who assaulted her, although the email may describe those punishments in slightly more detail. (*Compare* Dkt. No. 2, ¶ 69 *with* Dkt. No. 10-2.) Again, a large part of her complaint focuses on the punishment imposed on the men, which she describes as "grossly disproportionate and egregiously inadequate." (Dkt. No. 2 at 19.) Accordingly, the court concludes that the punishment imposed is integral to her complaint and so the court may also consider Exhibit B when ruling on the motion to dismiss, without converting the motion to one for summary judgment.

**C.  Plaintiff's Allegations Are Sufficient to State a Title IX Claim.**

To recover damages under Title IX where the plaintiff alleges peer-on-peer harassment, the plaintiff must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination and fails to adequately respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 671 (1999) (applying the *Gebser* standard in the context of student-on-student harassment).

In addition to the actual notice requirement, a Title IX plaintiff must also show that the defendant's response to the third-party harassment was so inadequate as to constitute "deliberate indifference"; mere negligence is insufficient. *See Gebser*, 524 U.S. at 290; *Davis*, 526 U.S. at 642 (holding that a school district is liable under Title IX "only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of . . . harassment of which it had actual knowledge"). In this context, an institution is deliberately

---

274, 291–92 (1998), for the proposition that "the failure to follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX").

indifferent "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Significantly, Title IX does not require that an institution "remedy" peer harassment, but simply that it "respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49.

The Supreme Court also made clear in *Davis* that Title IX liability is limited to circumstances where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. In other words, "[a] recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644. Further, "the deliberate indifference must, at a minimum 'cause [the plaintiff] to undergo' harassment or 'make [her] liable or vulnerable' to it. *Id.* at 644–45 (citations omitted).

Turning to the allegations here, the court first notes that Butters does not seek to hold JMU liable for the assault itself, nor has she alleged that JMU did anything to make her more vulnerable to the initial assault. Rather, it appears that both parties agree Butters seeks to impose liability for JMU's response (or inadequacy thereof) once JMU became aware of the assault and for the ongoing dissemination of the video after she complained.

JMU's primary argument is that Butters's allegations fail to allege sufficient facts to support any claim that JMU was deliberately indifferent. It points, in particular, to several allegations in the complaint. The first is that Butters, during her first meeting with Young, asked that JMU handle the complaint without her involvement, which JMU informed her it would not do. The second is that, after that meeting, Butters failed to initiate a formal complaint for almost nine months. Third, JMU relies heavily on the complaint's acknowledgement that, once Butters filed her formal complaint on January 10, 2014, JMU conducted an investigation, found

12

harassment, and imposed disciplinary sanctions on the harassers, including expulsion following graduation. It completed that process in approximately ninety days, including holding three separate hearings (one for each accused student) and a thorough appeals process, which included both the initial appeal from Butters, as well as the second round of appeals filed by the three men.

In response, Butters points out that Young's initial conversation with her "communicated an unmistakable impression that [JMU's] policy for handling student-on-student sexual assault and harassment, even when proven by video recording, was to discourage the victim from proceeding with a complaint." (Dkt. No. 2, ¶ 41.) She argues that Young's intent was to discourage and dissuade her from pursuing her complaint, and that Young accomplished her goal, at least temporarily. According to Butters, then, JMU should not be permitted to rely on her failure to file a formal complaint as grounds for its inaction.

As for the period after she filed her formal complaint, Butters focuses largely on her contention that the disciplinary penalties imposed were "grossly disproportionate and egregiously inadequate." (*Id.* ¶ 77; *see also id.* ¶ 2 (referring to the punishment a "wink and a nod and as "so-called punishment").) She argues that the discipline itself exhibited a deliberate indifference toward her entitlement to an equal education under Title IX. (*Id.* ¶¶ 75–77.) She also accuses the University of "mir[ing] the process in red tape and bureaucracy." (*Id.* ¶ 76.)

Applying the principles from *Gebser* and *Davis* to Butters's allegations, the court concludes that she has sufficiently pleaded a cause of action under Title IX. In particular, the court determines that the allegations in the complaint state a plausible claim of deliberate indifference, at least as to JMU's refusal—in the absence of a more formal complaint by Butters—to conduct any investigation or take any action after learning about the assault and the

13

existence and continued dissemination of the video.

In April 2012, Butters reported the assault "in graphic detail," told Young that the acts were not consensual, and gave her a copy of the video. Butters expressed during that meeting that she was very upset with the continued distribution of the video. She specifically asked if JMU could address the matter without her involvement. JMU took no action other than informing Butters of the formal complaint process, referring her to a counselor, and sending her a single follow-up email asking if she had made a decision as to whether to file a formal complaint. In particular, it did nothing to investigate the assault or to halt the distribution of the video. While taking no, or minimal, action absent a formal complaint from Butters may have been consistent with JMU's policy, it is at least plausible that it was deliberately indifferent under the particular circumstances alleged here. *See Rex v. W. Va. Sch. of Osteopathic Med.*, __ F. Supp. 3d __, 2015 WL 4756279, at *6 (S.D. W. Va. Aug. 11, 2015) (denying motion to dismiss Title IX claim of student who was drugged and raped by fellow students, where she alleged that she was harassed by attacker, other students, and staff as she pursued her claim; that there were no procedures in place for her to get support; and that the school "engaged in the investigation with the intention of minimizing the incident [and] protecting the school's reputation, all of which could constitute deliberate indifference").

JMU argues that it cannot be held deliberately indifferent for failing to take action during the ten-month period after Butters initially gave notice of the assault, and before she filed a formal complaint, because she admits that she was informed she could file a complaint, but did not do so. It relies, in part, on *DeCecco v. University of South Carolina*, 918 F. Supp. 2d 471 (D.S.C. 2013). The *DeCecco* court granted summary judgment in the defendant's favor on a Title IX claim, after concluding that the university was not deliberately indifferent because it

14

invited the student to make a formal complaint after she raised "vague allegations" of a sexually hostile environment, and she did not do so. *Id.* at 494.

Even if *DeCecco* were binding authority, the court does not believe it would control the outcome here because of significant differences between it and this case.[6] First of all, *DeCecco* was decided at the summary judgment stage instead of on a Rule 12(b)(6) motion.[7] Second, Butters's report to JMU cannot be described as "vague allegations" of harassment. Butters alleges that she informed JMU (through Young, if not Polglase) of a sexual assault in "graphic detail," (Dkt. No. 2, ¶ 37), that she informed it about the continued dissemination of the video, and that she provided a copy of the video at the conclusion of her meeting with Young. Third, Butters alleges that she specifically asked JMU to take action, just without her participation. (*Id.* ¶ 42 ("Ms. Butters . . . asked that the University handle the complaint without her involvement.").) *DeCecco* makes no reference to any similar request by the student there.

Moreover, in *DeCecco*, it was undisputed that no harassment or other adverse treatment occurred after the date the student was informed she could file a formal complaint. Thus, any indifference there "did not cause [the plaintiff] to suffer injury covered by Title IX." 918 F. Supp. 2d at 495; *see also Davis*, at 644–45 (requiring that, for deliberate indifference to give rise to a Title IX claim, it must "cause [plaintiff] to undergo" harassment or "make [her] liable or

---

[6] Further, to the extent JMU relies on *DeCecco* for the broad proposition that a student must follow the formal complaint procedure in order to give proper notice under Title IX, there is authority to the contrary. *See, e.g., Crandell v. N.Y. Coll. of Osteopathic Med.,* 87 F. Supp. 2d 304, 321 (S.D.N.Y. 2000) (*"*[U]nder *Gebser* and its progeny, an aggrieved student or employee need not follow the institution's official route for reporting sexual harassment. She must merely report to someone with authority to take corrective measures."); *Herndon v. Coll. of the Mainland,* Case No. G-06-0286, 2009 WL 367500, *22 (S.D. Tx. Feb. 13, 2009) (same).

[7] The court is familiar with the Supreme Court's announcement in *Davis* that, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not "clearly unreasonable" as a matter of law." *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 649 (1999). In this case, however, JMU's failure to take any steps to halt the dissemination of the video or to otherwise protect Butters from further harassment, particularly where there was a recording that, at least to some degree, supported her version of events, renders dismissal inappropriate.

15

vulnerable" to it).

Here, it is true that Butters does not allege that she suffered any *physical* harassment after her initial meeting with Young. But Butters alleges that she continued to be harassed through the continued dissemination of the video, and by fellow students repeatedly and frequently asking her about it and speaking with her about it. (Dkt. No. 2, ¶ 47.)[8] It is plausible that JMU's failure to take any action to stop the spread of the video, even a step as simple as asking that the original owner not distribute it further, could plausibly constitute deliberate indifference that made Butters vulnerable to additional harassment.[9] Thus, the court will not dismiss plaintiff's Title IX claim.[10]

---

[8] Butters also appears to be alleging that her participation in JMU's disciplinary process (by providing information and testifying, for example) also constituted harassment because it was uncomfortable and painful to have to face the men repeatedly and testify before both them and strangers. The court acknowledges that giving such testimony is almost always difficult for the alleged victim, especially emotionally. But there are rights that must be balanced in such cases, and it is not "clearly unreasonable" of a university to accord the accused certain procedural rights and safeguards. Further, to the extent Butters is claiming that the process itself is flawed because it required her to testify, that allegation might support an argument that JMU was negligent in its design of its policy, but it does not support a finding of deliberate indifference. *See infra* note 10.

[9] While it is not entirely clear that JMU could have slowed the distribution of the video, it is at least plausible that its failure to do anything may have contributed to the continued dissemination.

[10] Because of its ruling, the court does not need to determine at this time whether JMU's response *after* the formal complaint was filed could also constitute deliberate indifference. But it notes the ample authority holding that neither a school's negligence in addressing a sexual assault, nor its failure to provide the remedy wanted by the victim, constitutes deliberate indifference under Title IX. *See, e.g., KF v. Monroe Woodbury Cent. Sch. Dist.*, 531 F. App'x 132, 134 (2d Cir. 2013); *Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003); *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982 F. Supp. 2d 641, 657–58 (D. Md. 2013), *aff'd* 605 F. App'x 159 (4th Cir. 2014). By contrast, where there is complete inaction in the face of known harassment, deliberate indifference is an issue for the jury. *See, e.g., Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007) (en banc) (holding that deliberate indifference was a jury issue where the evidence showed that the administrator's response to student's detailed complaint of extensive and pervasive sexual harassment by her soccer coach was to tell the student that the coach was a "great guy" and that she should "work out her problems directly with him," and where the harassment continued afterward).

16

## III.  CONCLUSION

Because plaintiff has stated a plausible claim under Title IX, the court will deny JMU's motion to dismiss.  A separate order will be entered.

Entered: November 6, 2015.

*Elizabeth K. Dillon*
United States District Judge