IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| SARAH ELIZABETH BUTTERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 5:15-cv-00015 |
| | ) | |
| JAMES MADISON UNIVERSITY, | ) | By: Elizabeth K. Dillon |
| | ) | United States District Judge |
| Defendant. | ) | |

**MEMORANDUM OPINION**

In this action, plaintiff Sarah Butters brings a claim against James Madison University

(JMU) under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681(a),

which prohibits certain educational institutions from discriminating "on the basis of sex."[1]  Her

complaint alleges that, while she was enrolled as a student at JMU and on spring break in Florida

in March 2013, she was sexually assaulted by three male JMU students.  One of those students

made a video recording of at least a portion of the assault using his cell phone camera.  The

video was subsequently disseminated to other JMU students.  As discussed in more detail below,

Butters complained to JMU about the assault and the video and contends that the school's

response to both her initial complaint and her formal complaint, which was filed more than nine

months later, violated Title IX.

Pending before the court is JMU's motion for summary judgment, in which it argues that

the undisputed facts show that Butters's Title IX claim should not proceed to trial.  It contends

---

[1]  The statute provides that, with certain exceptions not relevant here, "[n]o person in the United States
shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to
discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C.
§ 1681(a).

that it is entitled to judgment in its favor on three grounds. First, it argues that the evidentiary record establishes that the harassment Butters experienced was not "so severe, pervasive, and objectively offensive that it created a hostile or abusive educational environment." (JMU Mem. Supp. Mot. for Summ. J. 16, Dkt. No. 59.) Second, it asserts that the record refutes any claim that JMU was deliberately indifferent or clearly unreasonable in its response to her report of harassment, as required to impose liability under Title IX. (*Id.* at 18.) Third, JMU claims that the record is devoid of evidence that JMU's response caused Butters to suffer further sexual harassment or to make her more vulnerable to it, "particularly in a context over which JMU has substantial control." (*Id.* at 23.)

The motion has been fully briefed, the court heard argument on the motion, and the court has considered all the written submissions of the parties, including the post-hearing submissions from the parties that were provided to chambers and docketed pursuant to a separate order. For the reasons set forth below, the court will grant JMU's motion for summary judgment.

## I. BACKGROUND

The court construes the evidence, and reasonable inferences therefrom, in the light most favorable to Butters, the non-moving party. *Laing v. Fed. Express Corp.*, 703 F.3d 713, 714 (4th Cir. 2013).

### A. Butters Is Assaulted While On Spring Break, and a Portion of the Assault Is Recorded.[2]

In the fall of 2010, Butters enrolled at JMU as a freshman. (Butters Dep. 25, Dkt. No. 62-4.) Her academic performance was somewhat inconsistent during her first two years. (*Id.* at 25–28.) Her first semester of her junior year, she had a 1.033 GPA, which she attributed to

---

[2] In light of the fact that JMU ultimately concluded, by a preponderance of the evidence, that Butters had been sexually assaulted, the court will utilize the term assault to refer to the incident and the term assailants to refer to the three men involved. Butters did not file criminal charges at any point with the police in either Florida or Virginia. (Butters Dep. at 62, 64.)

2

working more hours and undergoing surgery at the beginning of the semester.  (*Id.* at 28–29.)  In the next semester of Spring 2013—and before the March 2013 assault—Butters withdrew from three of her four classes.  (*Id.* at 29–30, 43; Tumer Decl. ¶¶ 11, 13, Dkt. No. 59-2.)  She explained that she withdrew to pick up "more hours for work because [she] was stressed about money and paying [her] medical bills."  (Butters Dep. 30.)  The one class in which she remained enrolled met only once each week, on Wednesday nights.  (Tumer Decl. ¶¶ 14–15.)  She was also working during this semester at a local hotel.  (Butters Dep. 12–13.)

During her spring break, Butters traveled to Panama City, Florida with a group of JMU students.  The trip was not planned or sponsored directly by JMU, but the purpose of the trip was to socialize with other JMU students.  (*Id.* at 44.)  On March 3, 2013, which was her second day there, Butters spent the day on the beach with her friends and consumed alcohol.  (*Id.* at 47.)  At some point, she went to the condo where the three men who appear on the video were staying.  (*Id.* at 49.)  This condo was in the same complex where she was staying.  (*Id.*)  The three men are Jay Dertzbaugh, Nick Scallion, and Mike Lunney (collectively the Assailants), and all three were friends of Butters's and members of the same fraternity as her boyfriend—Sigma Chi.  (*Id.*)  She does not know how she got to the condo or its bathroom, and she does not remember the assault actually occurring.  (*Id.* at 48–50.)  She remembers being on the beach, and the next thing she remembers is being with a few girls from another sorority in a condo other than her own at the same condo complex.  (*Id.* at 50.)  The next day, her close friend told her there was a video going around of her topless.  (*Id.* at 52–53.)  That was the first she had heard of the video or the incidents depicted in it.  While on spring break, she twice questioned Jay Dertzbaugh, with whom she knew she had been socializing that day, whether a video existed.  He denied it both times.  (*Id.* at 53–54, 61–62.)

The video itself takes place in a bathroom, apparently at the condo where the Assailants were staying. The copy provided to the court is approximately 90 seconds long, and it is difficult to see, and even more difficult to hear, what is happening.[3] Butters is topless throughout the video and is wearing only a bikini bottom. There are at least three distinct times in the video when the Assailants (or one of them) grab at her breast or breasts. So, the video clearly depicts contact of a sexual nature. But the video itself does not clearly depict whether the encounter is consensual or not, nor does it clearly reflect that Butters is too intoxicated to consent. For example, she appears to be standing on her own throughout most of the video, and she seems to be speaking and interacting with the men. Also, the video does not show what happened before any of the individuals entered the bathroom or how her top came off. (*See* Dkt. No. 1-1, Sealed Video.)[4]

**B. JMU Learns of the Assault, and Butters Decides Not to File a Judicial Complaint At That Time.**

Butters testified that, after she returned from her trip on March 10, 2013, she learned for certain that a video existed and that other JMU students in other fraternities either possessed the video or had seen it. (Butters Dep. at 55–60, 67–72 (describing people who had possessed or seen the video and estimating the number at "a few dozen").) She explained that, as far as she knew, the only distribution was via text and on students' cell phones. (*Id.* at 69–70.)

---

[3] Butters admits that the video is grainy or pixilated and that she cannot understand all the words in the video. (Butters Dep. at 93.)

[4] Butters asserts that, when she first learned about the video, it was described as being "of [her] topless and unable to stand or protect myself really and the gentlemen in the video are grabbing me and assaulting me." (Butters Dep. 55.) As the court has explained, though, the video does not clearly depict whether any portion of the encounter was consensual. Construing the facts in the plaintiff's favor, the video is ambiguous on the issue of consent. At the very least, then, as discussed in more detail herein, it was not clearly unreasonable for JMU ultimately to conclude that the video, standing alone, was insufficient to determine that a sexual assault had occurred.

She took some steps herself to try to stop the circulation of the video. She reached out to friends in three fraternities, each of whom had at least one member who had, or had seen, the video, and asked her friends to get rid of it or try to stop its distribution. (*Id.* at 72–74.) She also asked two people she knew that had the video to delete it in front of her, which they did. (*Id.* at 59, 68, 72.) With the assistance of her sorority sisters, she also met with the Assailants and discussed the assault and the video. (Butters Timeline, Lushbaugh Dep. Ex. 4, Dkt. No. 62-6.) According to a timeline she prepared as part of the complaint process, Butters stated that the video "was supposedly no longer circulating as of March 26, 2013." (*Id.*) Butters testified at her deposition that she did not know whether or not the video continued to circulate after that date. (Butters Dep. 74, 75, 77.) Instead, she said people were still discussing it, but she was not aware of any further circulation after March 26, 2013. (*Id.* at 75–76.) Butters has not provided any other evidence to show that the video continued to circulate after that date, either.[5]

It is undisputed that, from the time of the incident until March 27, 2013, neither JMU nor any JMU employee had notice of the assault, the video, or the video's alleged circulation. (Polglase Dep. 40, Dkt. No. 62-5.) Prior to that, Butters did not want "to escalate" the situation and "just wanted it to go away." (Butters Dep. 79.) The first notification to any JMU employee occurred on March 27, 2013, when a good friend and sorority sister of Butters's contacted the sorority's advisor, Paula Polglase. (Butters Dep. 16, 79; Polglase Dep. 7, 42.) Polglase was also employed by JMU at that time as the social media coordinator for university communications and marketing. (Polglase Dep. 7.)

---

[5] Part of the basis for the court's denial of JMU's motion to dismiss was that the complaint alleged that Butters wanted the defendants to stop the dissemination of the video and asked them to do so. (Mem. Op. 16 & n. 9, Dkt. No. 42 (reasoning that "[i]t is plausible that JMU's failure to take any action to stop the spread of the video . . . could plausibly constitute deliberate indifference that made Butters vulnerable to additional harassment" and "that [JMU's] failure to do anything may have contributed to the continued dissemination.") But discovery apparently has not led to any evidence that there was continued dissemination of the video after JMU was made aware of it.

5

Polglase immediately called Butters and then arranged to meet with her that evening. Prior to their meeting, Polglase contacted JMU's counseling center and the Office of Judicial Affairs (OJA) to determine what resources were available to Butters. (Polglase Dep. 46–48, 74–75.) The counseling center, in addition to informing her about certain resources, also advised her to notify a JMU Title IX officer, which she did.[6] When meeting with Butters, Polglase explained her options to her, which included meeting with OJA and obtaining counseling. (Butters Dep. 82.) Butters did not "jump" on any of the options, because she "wanted it to go away." (*Id.* at 83.)

On the same date, Butters's sorority sister contacted the president of Sigma Chi to meet to discuss the assault and the video. (*Id.* at 80–81.) Polglase participated in the meeting. (Polglase Dep. 109.) The men's fraternity determined that the three Assailants should be sanctioned. (*Id.* at 109–10, 115–16.) Specifically, the fraternity prohibited them from attending fraternity events and from having any contact with Butters. (Butters Dep. 138; Scallion Dep. 35–36, Dkt. No. 62-10.) Polglase was generally aware of these sanctions, and JMU employees Adam Lindberg in JMU's Office of Fraternity and Sorority Life, and James McConnell, JMU's Dean of Students, were also notified. (Lindberg Decl. ¶¶ 6–10, Dkt. No. 59-4.) The parties dispute the effectiveness of the fraternity-imposed sanctions, as discussed in more detail in Section II.B. *infra*.

---

[6] It is undisputed that Polglase was not associated with the OJA, although she was a person required to report violations of Title IX. Polglase also testified she had not received training with regard to Title IX's requirements, (Polglase Dep. 16–17), but JMU has provided an affidavit from Robinson, who was JMU's Title IX Coordinator, stating that JMU conducted Title IX training at all relevant times. (Robinson Decl. ¶ 11, Dkt. No. 59-9.) In any event, Polglase's lack of training is not material to the court's analysis.

6

The following day, March 28, 2013, Polglase contacted Wendy Lushbaugh, the Associate

Director of the Judicial Affairs. Polglase reported to Lushbaugh that three JMU students had

sexually assaulted Butters, that the incident was recorded on video, and that the video had been

distributed to others in JMU fraternities and sororities. (Lushbaugh Dep. 42.) The two women

then scheduled a meeting with Butters for March 29, although Butters cancelled that meeting.

(Polglase Incident Report, Dkt. No. 59-7; *see also* Butters Dep. 84 (stating she doesn't recall

whether she cancelled or not).) Butters and Lushbaugh rescheduled the meeting for April 12,

2013. (Polglase Dep. 81, 85; Polglase Incident Report).

On April 1, Polglase met with JMU's Title IX Coordinator, James Robinson, and notified

him of the situation. She explained the actions she had taken and explained what she had told

Butters in terms of advising of her of her options and resources. At the time (and through

Polglase's interactions with him), Robinson's understanding was that Butters was not ready to

move forward against the Assailants, did not want to get them into trouble, and wanted time to

explore her options. He asked Polglase to return with Butters once she was ready to move

forward or if she had questions. (Robinson Decl. ¶¶ 8–9.)

Butters and Lushbaugh met on April 12, 2013, and Polglase was also present. (Polglase

Dep. 87.) Butters testified that she remembers discussing the incident itself, and the fact that

there was a video circulating of it. (Butters Dep. 89–90; Lushbaugh Dep. 71 (recalling that

Butters had described that she had been sexually assaulted by three JMU students in Florida and

that the video had been circulating among JMU students).) Butters requested OJA to proceed

with the case against her Assailants solely on the video and without her involvement. (Butters

Dep. 93; Lushbaugh Dep. 49–50, 91; Polglase Dep. 87.) Lushbaugh told Butters that the OJA

could proceed without her only if the video itself was clear as to her description of the assault,

7

which was that she was intoxicated and did not consent.  She also explained that Butters would have to complete the paperwork consenting to the process.  (Polglase Dep. 88; Lushbaugh Dep. 84–85, 87.)  If the video was not clear, then Butters's involvement, at least in the form a written statement, would be necessary to provide context and to prove intoxication and lack of consent. (Lushbaugh Dep. 49–51.)

Lushbaugh also advised Butters that if she prepared the paperwork and consented to the process, she would not be required to attend any hearings.  (*Id.* at 90–91, 139–140, 141.)  She let Butters know that the decision to move forward was within her control, and Lushbaugh believed that giving a sexual assault victim control over the situation was important.  (*Id.* at 89–90.)

During the meeting, Butters reported to Lushbaugh that she had heard Nicholas Scallion threatened to "ruin her life" with the video if she filed charges.  (Butters Dep. 142.)  She also told Lushbaugh that she was anxious and fearful of the Assailants and was worried they would retaliate against her if she brought formal charges against them or if they learned she had made a report to OJA.  (*Id.* at 141–42, 164; *see also* Polglase Dep. 75–76.)

At the conclusion of the meeting, Butters told Lushbaugh she was not ready to file a complaint.  (Butters Dep. at 93 (saying she expressed that she "did not want to take on [the] burden" of going through the student conduct process, but that "she was interested in it moving forward without [her] efforts"); Lushbaugh Dep. 106, 119; Lushbaugh Decl. ¶ 6.)  Butters also requested that the meeting be confidential, in the sense that she did not want the Assailants to know she had met with anyone from OJA, (Butters Dep. 163–64), and that desire for confidentiality was something she expressed later, as well.  (*Id.* at 94–95.)  Butters testified at her

8

deposition that she does not recall whether she asked Lushbaugh to do anything about the video. (*Id.* at 90.)[7]

In addition to explaining the process, Lushbaugh arranged for Butters to meet with a counselor. She also notified Robinson, the Title IX Director, of the meeting. (Lushbaugh Dep. 69–71, 107; Butters Dep. 87–88.) Butters testified that she did meet with the counselor occasionally, although she also cancelled appointments "a lot." Butters testified she cancelled because she "didn't like talking to a counselor." (Butters Dep. 89, 96–99, 104.)

On April 16, 2013, Polglase gave Lushbaugh and Josh Bacon, the director of the OJA, a copy of the video. (Polglase Dep. 102–03.) They separately reviewed it and determined that the video itself was not sufficient to move forward with a case against the three men without Butters's participation and that they were going to require her to file formal charges with the OJA in order to proceed. (Lushbaugh Dep. 49–50, 91–92.) Lushbaugh advised Butters of this. (*Id.* at 91–92; 101.)

Shortly thereafter, on April 23, Lushbaugh emailed Butters to ask how she was doing and to ask whether she had made a decision about filing a complaint. (Lushbaugh Dep. Ex. 3, Dkt. No. 62-6 at 204.) She had also left her a voice-mail message. (Lushbaugh Dep. 101.) Butters did not directly respond to either. (*Id.*) Instead, Butters emailed Lushbaugh on May 6, asking Lushbaugh to call her, which Lushbaugh did. (*Id.* at 114.) Lushbaugh called her back and described Butters as being "in a panic," and asking Lushbaugh whether anyone from OJA had contacted the Assailants or told them that Butters had met with the OJA. (*Id.* at 115–16.)

---

[7] Butters claims that she told JMU to handle the matter and "in particular to stop the ongoing circulation of the video within the JMU community" but that she did not want to be identified as the person responsible for initiating the judicial process. (Pl.'s Opp'n to Certain Facts ¶ 23, Dkt. No. 65 (citing Ans. at ¶¶ 9, 12, 36; Lushbaugh 49:11–50:14, 71:18–20; Polglase 49:11–21; 82:11-16; *see also* Pl. 87:4–17; 93:7–14, 163:21–164:4).) The court has reviewed material she cites. While there is some evidence that Butters wanted JMU to proceed to take action against the Assailants without her involvement, none of the cited evidence supports the proposition that she asked JMU to stop the circulation of the video.

9

Butters seemed comforted once Lushbaugh assured her that no one from OJA had contacted the Assailants. (Lushbaugh Decl. ¶ 7.)

Butters spent the summer at home, but after she returned to JMU, she had no contact with any of the Assailants during the Fall 2013 semester.

### C. Butters Files a Formal Complaint, and JMU's Adjudicates Charges Against Her Assailants.

After Butters returned to campus for the Fall 2013 semester, on September 6, 2013, Lushbaugh emailed Butters and asked whether she had made a decision as to how to proceed and asked if she had any questions. (Butters Dep. 97; Lushbaugh Decl. ¶ 9.) Butters did not respond to this email until November 11, 2013. (Lushbaugh Decl. ¶ 9.) According to her own testimony, she did not respond to the OJA because she "felt like no one cared so I didn't really care." (Butters Dep. 104.) She testified that she felt like she had given OJA "what it needed to move forward, *i.e.*, the video," and she was not "up to meeting with anyone at JMU at the time." (*Id.*)

On November 4, 2013, Butters's father, William Butters, emailed JMU's Senior Vice President for Student Affairs and University Planning, Mark Warner, and inquired about the status of her complaint. (Emails, Dkt. No. 59-14.) Warner passed on the inquiry to James McConnell, who in turn directed Mr. Butters to Josh Bacon. (Warner Dep. 42, Dkt. No. 62-8.) Warner and McConnell also both separately responded to Mr. Butters. (Emails, Dkt. No. 59-14.) Bacon called Mr. Butters, explained the policy, and asked him to have his daughter come to OJA to move forward. (W. Butters Dep. 57, Dkt. No. 59-8.)

On November 11, 2013, Butters responded to Lushbaugh's September 6, 2013 email and said she wanted to schedule a meeting with the OJA. A meeting was arranged for November 18, 2013, which Butters canceled. There were other attempts to schedule a meeting, but either

Butters did not show up or, as to other dates subsequently offered, did not respond until after the dates had passed. (Lushbaugh Decl. ¶ 10.)

On December 17, 2013, Butters told Lushbaugh that she was ready to file a complaint with the OJA. (*Id.* at ¶ 11.) Because the holiday break was about to begin, Lushbaugh and Butters agreed to meet on January 6, 2014. (*Id.* at ¶ 12.) Butters did not show up for the January 6, 2014 meeting, which was rescheduled for January 10, 2014. On that date, Butters consented to the process and filed a complaint against her Assailants. Pursuant to JMU's Policy, Lushbaugh arranged for Butters to have a support person and put her in touch with JMU employee Liz Howley. (Butters Dep. 113–14.) Howley served as a support person to Butters throughout the process, and Butters was very happy with Howley. (*Id.* at 114, 121–22.)

Lushbaugh notified Robinson and Title IX officer Amy Sirocky-Meck of Butters's decision, and, on January 15, 2014, JMU charged the three men with sexual assault and harassment. JMU warned them that any contact with Butters would result in a further charge. JMU states that Butters admitted the no-contact order was effective; in fact, Butters admitted that none of the men contacted her afterward, (*id.* at 130), but she disputes that it prevented her from seeing them. *See* infra at Section II.B.

At the first level of the hearing process, Butters testified at three separate hearings—one for each Assailant—and Bacon presided at those hearings. (Lushbaugh Dep. 142.) Bacon found all three responsible for sexual assault and harassment by a preponderance of the evidence. (Lushbaugh Decl. ¶ 17.) After giving Butters notice of the sanctions he intended to impose, Bacon announced his decision. Believing those sanctions to be inadequate, Butters exercised her right to reject the administrative decision. (Lushbaugh Decl. ¶ 19.) On March 20, 2014, there was a second level of hearings, with another three hearings occurring on the same day before the

Judicial Council. The Judicial Council increased the sanctions (which had essentially been expulsion after graduation (and other sanctions)) and ordered the immediate expulsion of all three men from JMU. (Lushbaugh Decl. ¶ 20.)

All of the men exercised their right to appeal, and on April 2, 2014, JMU again conducted separate appeal hearings. As with each stage of hearings, Butters had a support person with her and was separated from each of the men by a partition, although she explained that they could still see each other. (Butters Dep. 105–06, 117, 121; Lushbaugh Decl. ¶ 21.)

The appeal board reduced the sanction imposed on each of them, imposing instead the following sanctions:

- Each of the men would be expelled from JMU upon graduation, which would preclude them from returning to the JMU campus after graduation for any reason at all (including taking graduate classes or attending events), and a violation would result in an arrest for criminal trespass;[8]

- None of the men could walk at their upcoming graduation ceremonies;

- None of the men could have any contact with Butters;

- Each of the men was prohibited from being present on the JMU campus, except for classes, and none were permitted to participate in any JMU student clubs or organizations; and

- The men were to create, in conjunction with the OJA, a 30-minute presentation on sexual assault for possible presentation to student organizations.

(Lushbaugh Decl. ¶ 21.)

The sanctions were approved by Warner on April 3, 2014, and he explained them to Butters in person on April 9, 2014. Butters was upset with the decision and wanted different sanctions. (Butters Dep. 129–30, 147.) During the OJA process, JMU also provided Butters with the opportunity to seek retroactive withdrawal from her fall 2013 and spring 2014 classes,

---

[8] Butters points out, though, that at least some of the Assailants still have JMU email addresses and access to their JMU email accounts. (Scallion Dep. 30–31; Dertzbaugh Dep. 24, Dkt. No. 62-12.)

although she chose to withdraw only from the latter. (Butters Dep. 111–12, 134.) Ultimately, Butters's financial aid was revoked because she was not making satisfactory academic progress and was not on "pace" to qualify for financial aid. (Tumer Decl. ¶¶ 8–20.) She subsequently withdrew from all of her spring 2014 classes. She has not paid for them, nor has JMU attempted to collect tuition for them. (Tumer Decl. ¶ 23.) She has not re-enrolled at JMU.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Under Rule 56, summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only where the record, taken as a whole, could lead a reasonable jury to return a verdict in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). In making that determination, the court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).

A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citations omitted). Moreover, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247–48. Instead, the non-moving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.3d 924 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

13

**B. The Undisputed Facts Establish that JMU Was Not Deliberately Indifferent**

As noted, JMU contends that it is entitled to summary judgment on several grounds. But the court need not reach most of those grounds because any one is sufficient to grant summary judgment, and the court concludes that the undisputed facts establish that JMU was not deliberately indifferent to known harassment over which it had control.

The court set forth much of the law governing Title IX's deliberate indifference standard in its opinion denying JMU's motion to dismiss, but will repeat some of it here. To recover damages under Title IX where the plaintiff alleges peer-on-peer harassment, the plaintiff must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination and fails to adequately respond." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 671 (1999) (applying the *Gebser* standard in the context of student-on-student harassment).

In addition to the actual notice requirement, a Title IX plaintiff must also show that the defendant's response to the third-party harassment was so inadequate as to constitute "deliberate indifference." *Gebser*, 524 U.S. at 290; *Davis*, 526 U.S. at 642 (holding that a school district is liable under Title IX "only where the district itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of . . . harassment of which it had actual knowledge"). In this context, an institution is deliberately indifferent "only where [its] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis*, 526 U.S. at 648. Significantly, Title IX does not require that an institution "remedy" peer harassment, but simply that it "respond to known peer harassment in a manner that is not clearly unreasonable." *Id.* at 648–49.

14

The Supreme Court also made clear in *Davis* that Title IX liability is limited to circumstances where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. In other words, "[a] recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644. Further, "the deliberate indifference must, at a minimum 'cause [the plaintiff] to undergo' harassment or 'make [her] liable or vulnerable' to it." *Id.* at 644–45 (citations omitted).

Butters does not argue that JMU should be held responsible for the assault itself. Thus, the question is whether its response upon learning of the assault constituted a violation of Title IX. The court evaluates that response in two stages: 1) after JMU employees learned of the assault and before Butters filed her formal OJA complaint, *i.e.*, from March 27, 2013, through January 10, 2014; and 2) after the formal complaint was filed.

**1. JMU's Response Between March 27, 2013, and January 10, 2014**

After learning of the assault and the video, Paula Polglase immediately spoke with Butters. She advised her of the resources available to her, including the availability of counselors and the availability of the OJA process. Polglase notified the Title IX Coordinator, Robinson. Polglase also arranged for Butters to meet with Wendy Lushbaugh, a meeting that Butters initially postponed. When the meeting occurred, Lushbaugh explained the policy to Butters. Butters was also told that, if she filed a judicial misconduct complaint, a no-contact order would be put in place. Lushbaugh also referred Butters to a counselor, a service that Butters occasionally used.

When given her options during the meeting with Lushbaugh, Butters asked if JMU would act without her involvement. As Butters's own testimony makes clear, she was very concerned

15

that she not be identified as the person responsible for complaining to OJA and so, while she was wanted the matter investigated, she wanted confidentiality and wanted the matter investigated without her involvement.

In response, Lushbaugh stated that OJA would review the video and see if it could investigate without Butters consenting to the formal process. Later, upon review of the video, Lushbaugh and Bacon concluded that the video alone was not sufficient to pursue the claim and that Butters would be required to file a complaint in order to proceed with any disciplinary proceedings against the three men. Butters did attend some counseling sessions, and Lushbaugh continued to reach out to Butters to see if she was interested in filing an OJA complaint.

In her opposition, Butters is emphatic about the other things that JMU could have done during this period. For example, she points to testimony from Sirocky-Meck that the Title IX department could have investigated the incident without Butters's participation, could have contacted the Assailants and interviewed them concerning the assault and the video, and could have obtained a "no-contact order" to protect Butters as a sexual assault victim who feared retribution. (Sirocky-Meck Dep. 58–59.) She points out that the OJA had authority to adjudicate Butters's complaint, ban the accused students from campus, except for attending classes under an "interim suspension policy" and, even in the absence of a formal complaint or criminal charges, could have altered students' classes or changed their residence. (Pl.'s Opp'n at 9–10.)

There are at least three problems with Butters's arguments about what JMU could have done: 1) she seems to be asking the court to employ a standard of either "best practices" or a "reasonableness" standard, but the standard for Title IX liability in this case is deliberate indifference; 2) many of the courses of action would have violated Butters's request for confidentiality; and 3) many of the recommended actions were neither possible nor necessary

16

under the facts of this case.  The court discusses each of these issues in conjunction with

explaining the lack of evidence to support deliberate indifference by JMU.

First, as noted above, Butters must show that JMU was "deliberately indifferent" or that

its actions were "clearly unreasonable."  A showing  that JMU did not employ the best practices

or even that it was negligent is insufficient.  Deliberate indifference is a difficult showing to

make, and was described by the *Davis* Court as a "high standard."  526 U.S. at 643.[9]  That

standard was met in *Jennings v. Univ. of N.C.*, 482 F.3d 686, 701 (4th Cir. 2007) (en banc),

where the Fourth Circuit held that deliberate indifference was a jury issue.  There, the university

administrator's response to a student's detailed complaint of extensive and pervasive sexual

harassment by her soccer coach was to tell the student that the coach was a "great guy" and that

she should "work out her problems directly with him."  *Id.* at 700.  The harassment continued

afterward.  *Id.*  This response was obviously a far cry from the steps taken by JMU here.

Even in cases where universities have done seemingly little in response to a complaint of

sexual assault, courts have held there was no deliberate indifference.  In *Ostrander v. Duggan*,

341 F.3d 745 (8th Cir. 2003), for example, the plaintiff was sexually assaulted in an off-campus

building by a fraternity member.  341 F.3d at 747.  The university responded by meeting with the

fraternity's chapter advisor and writing to the national president to inform him that the university

expected the fraternity to conduct an investigation and to sponsor an educational program.  *Id.* at

748.  The court concluded that there was no deliberate indifference as a matter of law.  *Id.* at 751.

Similarly, in *KF v. Monroe Woodbury Central Sch. Dist.*, 531 F. App'x 132 (2d Cir.

2013), the school district learned that a student had been sexually assaulted and recommended

---

[9]  At least one commentator has recently argued that the standard is too high and that it continues to allow inequality on the basis of sex in the educational setting.  Catharine A. MacKinnon, *In Their Hands: Restoring Institutional Liability for Sexual Harassment in Education*, 125 Yale L.J. 2038, 2083, 2096 (2016) (surveying cases and concluding that especially in the student-on-student setting, deliberate indifference is infrequently found, and advocating instead for a "due diligence" standard).

17

that she attend an out-of-district program for students with disciplinary problems. When her parents refused that placement, the school provided her with individual tutoring and told her parents they could file a grievance with the school's Title IX officer if they were unsatisfied. 531 F. App'x at 134. The appellate court agreed with the district court that the response, as alleged in the complaint, did not constitute deliberate indifference. *Id.*

The second problem with Butters's contentions about what JMU could have—or should have—done is that many of her proposed courses of action would have required a violation of Butters's request for confidentiality, which JMU was attempting to honor. The court simply cannot agree that JMU's decision not to pursue disciplinary action against the Assailants without her involvement constitutes deliberate indifference. First of all, while the video itself shows sexual contact, it does not show that it was not consensual or that Butters was so incapacitated as to be unable to consent, as the court has already discussed. Instead, the lack of consent could be ascertained only with the additional information that Butters was so intoxicated she did not even remember the incident. For that context, JMU needed Butters's statement. Put differently, it was not "clearly unreasonable" of JMU to conclude that the video alone was insufficient to proceed and that it needed Butters's contextual statement (that she had been drinking, that she was very intoxicated, that she had no memory of the event), in order to show that she could not have consented.

Given her grave concerns with confidentiality, it also was not clearly unreasonable for JMU to want her to consent to the process before investigating or charging the Assailants. As explained by Lushbaugh during her deposition, it was very important to Lushbaugh that Butters be given control over the decision as to whether to proceed (Lushbaugh Dep. 41, Dkt. No. 62-6), and the record is unmistakably clear that Butters did not want the men to know she was the

instigator of any investigation, nor did she want to be involved.  So, while Butters did ask JMU to move forward against her Assailants without her involvement, when that route became unavailable (due to the video's ambiguity as to consent), she was given control over whether or not to pursue a charge.

One of the issues implicated by the facts here, then, is whether a school's response constitutes deliberate indifference if the school requires a complaining party who wants to remain confidential to initiate a formal process before beginning disciplinary proceedings against the alleged perpetrators.  On this issue, Butters relies, in part, on the April 4, 2011 Dear Colleague Letter (DCL) written by the Department of Justice and sent to university administrators, among others.  (DCL, Dkt. No. 62-2.)  The DCL is a self-described "significant guidance document," purporting to explain to Title IX recipients the requirements applicable to dealing with student-on-student sexual harassment.  (DCL 1–2 & n.8.)

It directs schools to

> inform and obtain consent from the complainant . . . before beginning an investigation.  If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation.  If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited. . . . Even if the school cannot take disciplinary action against the alleged harasser because the complainant insists on confidentiality, it should pursue other steps to limit the effects of the alleged harassment and prevent its recurrence.

(DCL at 5.)  Steps identified could include "allowing students to change academic or living situations as appropriate," prohibiting contact between the victim and the alleged perpetrator, taking steps to prevent retaliation, including advising the complainant of how to report such

problems, providing counseling services, medical services, or academic support services. (DCL at 15–17.) Butters contends that JMU failed to follow this guidance.

The DCL itself, however, notes that it sets forth a standard for "administrative enforcement of Title IX and in court cases where plaintiffs are seeking injunctive relief." (*Id.* at 4 n.12.) The standard it enunciates—that Title IX requires a school that "knows or reasonably should know about" harassment that creates a hostile environment, to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects"—is different from the standard applicable "in private lawsuits for monetary damages[, which] is actual knowledge and deliberate indifference." (*Id.* (citing *Davis*, 526 U.S. at 643, 648).)

The court asked Butters's counsel to provide any authority holding that a failure to abide by the guidance in the DCL is tantamount to "deliberate indifference," but the authorities provided do not stand for that proposition. Indeed, nearly all of the cases Butters cited, and most other cases discussing the weight to be given the recommendations in the DCL, appear to reject that proposition, although many hold that a school's compliance or non-compliance with the DCL can be a factor that the court considers. *See, e.g., Karasek v. Regents of the Univ. of Cal.*, No. 15-cv-3717, 2016 WL 4036104, at *11 (N.D. Cal. July 28, 2016) ("Failure to adhere to the DCL may be bad policy, but standing alone it does not constitute deliberate indifference."); *Ross v. Univ. of Tulsa*, No. 14-cv-484, 2016 WL 1545138, at *14 (N.D. Okla. Apr. 15, 2016), *appeal pending*, No. 16-5053 (10th Cir.) (holding that failing to follow best practices or the guidance in the DCL did not render the university's response deliberately indifferent); *Moore v. Regents of the Univ. of Cal.* No. 15-cv-5779, 2016 WL 2961984, at *5 (N.D. Cal. Mar. 23, 2016) (rejecting as "misguided" the plaintiff's argument that the court should defer to guidance such as the DCL letter in deciding whether a university's actions amount to deliberate indifference); *Doe v. Forest*

*Hills Sch. Dist.*, No. 1:13-cv-428, 2015 WL 9906260, at *10 (W.D. Mich. Mar. 31, 2015)

("Although failure to comply with Title IX guidance does not, on its own, constitute deliberate

indifference, it is one consideration."); *Bleiler v. Coll. of Holy Cross*, No. 11-cv-11541, 2013

WL 4714340, at *5 (D. Mass. Aug. 26, 2013) (noting that the guidance in the DCL "does not

have independent force of law but informs this Court's evaluation of whether the College's

procedures were 'equitable'"). *But see Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462, 465 & n. 7

(S.D.N.Y. 2015) (citing to the DCL and describing it as a "significant guidance document," and

using the guidance to evaluate a college's disciplinary proceedings as they relate to due process).

Thus, even if JMU had violated the guidance set forth above—and it is not clear to the court that

it has—that would not be dispositive on the issue of deliberate indifference.

Even if the court considered non-compliance with the DCL as a factor, there is little

guidance to be gleaned from other cases as to a university's obligation, if any, to proceed with an

investigation into sexual assault where the victim does not want to participate. The court has

found only a few cases addressing the issue. In *Roe v. St. Louis Univ.*, 746 F.3d 874 (8th Cir.

2014), the court concluded that the defendant university did not act with deliberate indifference

where, after a school employee learned the plaintiff had been sexually assaulted, the employee

met with the plaintiff, referred her to a counselor, and informed her how to file a complaint, but

the plaintiff declined to file a formal report of the assault and told several university employees

she did not want her parents told. *Id.* at 883. In reaching its conclusion that there was no

deliberate indifference, the court relied, in part, on the plaintiff's "expressed desire for

confidentiality." *Id.*

In *Ross v. Univ. of Tulsa*, No. 14-cv-484, 2016 WL 1545138, at *14 (N.D. Okla. Apr. 15,

2016), *appeal pending*, No. 16-5053 (10th Cir.), the issue of a request for confidentiality was

21

discussed only indirectly. In *Ross*, the plaintiff alleged she had been raped by a member of the men's basketball team, a man named Swilling. After the plaintiff's report, those involved in the disciplinary process became aware of two prior allegations of rape and a second incident of attempted sexual misconduct by Swilling. As part of its discussion of "deliberate indifference," the court evaluated the university's earlier response to the alleged rape of one of the prior victims, Jane Doe 1.

Specifically, a football player had reported that Jane Doe 1 had been raped by Swilling, as witnessed by the football player's girlfriend. 2016 WL 1545138, at *13. In response to that report, the campus police contacted Jane Doe 1 and asked her to make a statement. *Id.* She did not use the word rape or assault, although she expressed that Swilling took "advantage of" her. *Id.* at *14. Jane Doe 1 also made clear that she did not want to make an official report to the police or to file a student conduct complaint, explaining that she did not wish to accuse Swilling of anything and did not want to think about it. *Id.* at *13. She said she was scared and she did not want everyone to know her business, and she was worried that people would not believe her. *Id.* The court noted that, although the response and failure to investigate meant that the university did not follow best practices or the OCR's guidance in the DCL, its failure to investigate the Jane Doe 1 incident further was not "deliberately indifferent" in light of the nature of Jane Doe 1's report and all the circumstances. *Id.* at *14.

The facts here are slightly different than in either *Roe* or *Ross*, because Butters requested that JMU investigate; she just wanted JMU to do so without her involvement and without her having to file a formal charge. But again, in light of all the circumstances here—which included a video ambiguous as to consent—it was not clearly unreasonable of JMU to require a complaint from Butters before further investigating and taking any action against the three men. And

22

JMU's lack of indifference is further highlighted by its swift response once she did file her complaint.

One of Butters's chief complaints focuses on her allegation that JMU did not do more to ensure she would not encounter the Assailants. Some of the steps she suggests JMU could have taken, however, appear not to be possible or necessary here, which is the third problem with her overall argument. For example, she talks about the option of changing classes or being given different living arrangements. But it appears undisputed that Butters and the Assailants had no classes together (Scallion Dep. 34; Lunney Dep. 36–37, Dkt. No. 62-11; Dertzbaugh Dep. 25–26, Dkt. No. 62-12), and all three of them and Butters lived off-campus. Thus, those particular steps would not have served any purpose here. Moreover, there is no evidence Butters asked for those accommodations.

With regard to interim measures JMU could have taken prior to the filing of a judicial misconduct complaint, the court also notes that, in fashioning any such measure, JMU had to consider not only Butters's concerns, but also any rights of the accused. A number of the cases cited by the parties acknowledge this balancing act. *See, e.g.*, *Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 WL 1563424, at *5 (D. Conn. Mar. 26, 2003) (noting that it may not have been "feasible" for the university to take an action against the accused—such as prohibiting him from attending certain classes—that would penalize him prior to "any formal determination of wrongdoing"); *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1087, 1089 (9th Cir. 2006) (noting that, upon filing of formal complaint, a no-contact order was issued against a professor who was accused of sexually harassing the plaintiff, but that the school's policy did not allow him to be disciplined immediately, and ultimately finding no deliberate indifference even though she twice ran into him on campus while her claim was pending).

JMU points to Sigma Chi's no-contact order given March 2013, of which JMU was aware, as an interim measure. It also contends that its own no-contact order, issued in January 2014, after Butters filed her formal complaint, was a protective measure for Butters. But while JMU repeatedly states that both the fraternity's no-contact order and its own were effective, Butters has presented some evidence disputing that. To be sure, Butters testified that she did not have any contact with the Assailants after Spring 2013, and admits that none of them ever contacted her or violated the no-contact order imposed by JMU. (Butters Dep. 130, 142–43.)

But Butters testified that she crossed paths with all three of the Assailants "a lot," and saw them "multiple times" during the Fall 2013 semester (Butters Dep. 140–41), although it appears that none of these encounters were on campus. (*Id.*) She also has provided evidence that the three continued to attend informal fraternity functions and related social events after they were supposedly expelled from the fraternity, and that two of them continued to live in the off-campus fraternity house. (*Id.* at 130–33, 139–40; Dertzbaugh Dep. 8, 29, Dkt. No. 62-12; Lunney Dep. 39–40, Dkt. No. 62-11.) Butters was dating another Sigma Chi member, but she made every effort to avoid the three men, and to not attend functions if she knew they would be there. (Butters Dep. at 130–33; 137–41.)

She also complains that the Assailants continued to attend social events such as the Turkey Bowl, a philanthropic event hosted by her sorority, and that they attended Derby Days in the Spring 2014 semester, while the judicial proceedings were ongoing.[10] (Polglase Dep. 116–20 & Ex. 2.) Butters reported at least the Derby Days incident to Polglase, who in turn brought the matter to the attention of Lindberg. (*Id.*) Butters complains that Lindberg took no action in

---

[10] Derby Days was a philanthropic event for all fraternities and sororities that was hosted by the men's fraternity, Sigma Chi. Butters had a leadership role for her sorority in the event. The event was held at off-campus locations (primarily at the Sigma Chi house) and not on JMU's campus.

24

response to this complaint, although it is unclear that Lindberg had any authority to do so, because Sigma Chi's house, where Derby Days was held, was off-campus.[11] When Butters complained to Lushbaugh about seeing the Assailants at parties that they were not supposed to attend, the OJA did not take action, but referred Butters to Fraternity and Sorority Life instead. (Lushbaugh Dep. 48, 151.)

The fact that Butters saw the men in off-campus social settings while the fraternity's (or JMU's) no-contact order was in place is a factor the court has considered. But, when viewed in the totality of the circumstances of JMU's actions, the court cannot conclude that these encounters could allow a jury to find JMU's response deliberately indifferent.

As JMU notes, Butters's argument seems to be that the mere presence of the men in or around the campus could support a finding of deliberate indifference. The cases that Butters relies on for this proposition are *Kelly v. Yale Univ.*, No. 3:01-cv-1591, 2003 WL 1563424 (D. Conn. Mar. 26, 2003), and *Patricia H. v. Berkeley Unified Sch. Dist.*, 830 F. Supp. 1288 (N.D. Cal. 1993). The court does not find either case to be persuasive authority here.

The court agrees that *Kelly* generally supports the theory that a university's failure to separate an alleged victim and attacker during a grievance process could support a claim of deliberate indifference. There, after the plaintiff reported a sexual attack by a fellow student and filed a formal complaint, the university's sexual harassment committee researched the incident, held a hearing, found a sexual violation, and required that the attacker take a leave of absence until after the plaintiff's expected graduation. *Kelly*, 2003 WL 1563424, at *1. The plaintiff argued that, during the grievance process itself, she repeatedly requested academic assistance and

---

[11]  JMU complains about plaintiff's assertion of Lindberg's inaction, and notes that plaintiff never deposed Lindberg. It also offers a declaration from Lindberg with his undisputed testimony that JMU does not own or control Sigma Chi's private property and has no authority to remove a member of its fraternity. (Lindberg Decl. ¶¶ 5–7, Dkt. No. 69-1.) Based on this, JMU argues it could not exercise control over the fraternity, prohibit the Assailants from residing in the house, or stop them from attending off-campus fraternity functions.

academic planning, but that Yale provided none.  *Id.* at *2.  She also repeatedly requested alternative housing since her attacker lived in the same dormitory, but Yale did not assist her with that request.  *Id.*  Instead, she secured alternative housing herself several weeks after her complaint was filed, after a professor intervened on her behalf.  *Id.*

Like Butters, the plaintiff in *Kelly* did not argue that her school should be liable for the attack itself as it had no notice of it.  *Id.* at *4.  Instead, she claimed that her attacker's continued presence on campus during the course of the disciplinary proceedings and the accompanying risk that she might encounter him created a hostile environment.  *Id.*  The court concluded that Yale's refusal to bar the attacker from classes was not clearly unreasonable, particularly given the rights of the accused implicated by her request.  *Id.* at *5.  But it found it "substantially less clear" whether "Yale's particular course of action—in which minimal efforts were made to protect Kelly from further harassment prior to the completion of the grievance procedures[,] violated Title IX."  *Id.*  Ultimately, it denied summary judgment on her Title IX claim, concluding that a reasonable jury could find that Yale's failure to respond to her request for either academic or residential accommodations could constitute deliberate indifference.  *Id.* at *4.

The court also found that Kelly had raised an issue of material fact with respect to whether the harassment was "severe or pervasive."  It reasoned that "a reasonably jury could conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university."  *Id.* at *3.

As an initial matter, the court notes that there are significant factual distinctions between *Kelly* and this case.  Perhaps most importantly, both Kelly and her attacker lived in the same on-campus dorm, an area over which Yale clearly had control.  Here, by contrast, Butters and her

Assailants all lived off-campus in housing not controlled by JMU. And the times that she encountered them occurred off-campus. Furthermore, the plaintiff in *Kelly* had filed a formal complaint, requested specific help in the form of different housing and academic separation from her attacker, and the university failed to respond to her requests or to take action to try to separate the two while the proceedings were pending. Here, Butters had repeatedly declined to file a formal complaint, but when she did so, JMU immediately issued its own no-contact order.

Furthermore, *Kelly* is not binding on this court and, in any event, may be an outlier on this issue. *Compare, e.g.*, *Oden*, 440 F.3d at 1089 (affirming district court's grant of summary judgment and concluding there was no deliberate indifference by school where the plaintiff student reported that her music professor had sexually harassed her and, during the pendency of the disciplinary proceedings, the plaintiff encountered the professor twice on campus while attending other classes, because the school there had taken a number of steps to assist the plaintiff after she made her report, including issuing a no-contact order).

Butters also relies on *Patricia H.*, 830 F. Supp. 1288, for the proposition that her continued exposure to the Assailants constitutes further harassment. In that case, the court noted that the victim of a sexual assault potentially "would be intimidated and fearful of [her attacker's] presence at her school [and] that her fear would interfere with her ability to learn . . . even though the [assaults] were isolated in time and occurred outside of the school setting." *Id.* at 1297. The court does not dispute the general truth of that statement, but *Patricia H.* itself is of no assistance to Butters. First of all, the case was decided prior to both *Gebser* and *Davis*, and thus did not apply the proper deliberate indifference standard. *Id.* at 1291–92, 1297 (applying Title VII sexual harassment standards and concluding that the school district could be held liable

if it failed to take "immediate and appropriate" action "reasonably calculated" to remedy the harm). Furthermore, the facts there are wholly inapposite.[12]

The court does not doubt that seeing her Assailants off-campus was disturbing to Butters. But she admits that none of them contacted her, either directly or through a third party, at any point after she reported the assault to JMU. Likewise, there is no evidence that she saw them anywhere within the physical control of JMU. In light of these circumstances, no reasonable jury could conclude that these encounters caused JMU's response to amount to deliberate indifference.

### 2. JMU's Response After Plaintiff Filed An OJA Complaint

As to JMU's response to the formal complaint, which included an investigation, a no-contact order during the course of it, and the imposition of a punishment on all three men, the court likewise concludes that plaintiff has insufficient facts from which a jury could find deliberate indifference. Upon receipt of Butters's formal complaint, JMU initiated disciplinary proceedings, and ultimately found the three men guilty and disciplined them. Although it was not the punishment Butters wanted, punishment was imposed. *S.B. v. Bd. of Educ. of Harford Cnty.*, 819 F.3d 69, 77 (4th Cir. 2016) (applying *Davis* deliberate indifference standard to Rehabilitation Act case and stating that, while deliberate indifference can exist where a school has simply conducted a "half-hearted investigation" or implemented ineffective remedial measures, "[a] school's actions do not become 'clearly unreasonable' simply because a victim . . . advocated for stronger remedial measures"); *Doe v. Bd. of Educ. of Prince George's Cnty.*, 982

---

[12] The victims in that case were sisters who were molested by a man, a teacher, while he was romantically involved with their mother when they were in elementary school. *Id.* at 1294. After being briefly suspended, the man was reinstated by the defendant school district, and years later, when they were in high school, both girls occasionally saw him on school grounds. *Id.* at 1294–95, 1296. Their mother sought assistance from the school in preventing her daughters from encountering him, an experience that caused both girls severe fear and psychological harm. *Id.* at 1297. The only response she got was the suggestion that she move her daughters out of the district. *Id.*

28

F. Supp. 2d 641, 657 (D. Md. 2013), *aff'd*, 605 F. App'x 159, 168 (4th Cir. 2015) (explaining that Title IX plaintiffs lack the "right to make particular remedial demands") (quoting *Davis*, 526 U.S. at 648); *KF v. Monroe Woodbury Central Sch. Dist.*, 531 F. App'x 132, 134 (2d Cir. 2013) (affirming the district court's dismissal of the Title IX claim against a school district for lack of deliberate indifference where, after the district learned of the sexual assaults against the high school student, it recommended she attend an out-of-district program, which she and her parents rejected as an inappropriate placement, and instead provided her with individual tutoring).

Butters also complains about the process, and the fact that it required her to testify multiple times, at multiple hearings, and that it permitted several levels of appeals, which required additional testimony to appeal. But whether JMU could have designed a more victim-friendly system, whether it could have taken steps to protect Butters better, or even whether JMU followed its own policy to the letter, are not dispositive. *See Kelly*, 2003 WL 1563424, at *5 (recognizing that schools must consider the rights of the accused when determining an alleged victim's entitlement to protection); *Doe v. Bd. of Educ. of Prince George's Cnty.*, 605 F. App'x 159, 168 (4th Cir. 2015) (affirming district court's reasoning that "the failure to follow sexual harassment grievance procedures does not prove deliberate indifference under Title IX"). Instead, the sole question is whether JMU's response was "clearly unreasonable." *Oden*, 440 F.3d at 1089 (reasoning that a college's delay of 9 months in holding a disciplinary hearing, which was supposed to be held within 30 days of the complaint under its policy, was "negligent, lazy, or careless," but not deliberately indifferent). Here, the court concludes that no reasonable jury could conclude that the process was "clearly unreasonable."

29

* * *

The court's ruling that JMU was not deliberately indifferent, while dispositive of plaintiff's claims here, is a narrow one. This opinion does not determine whether or not JMU's response was the best one, the discipline imposed was the most appropriate possible punishment, or JMU acted reasonably and without negligence. Those issues are not before this court. Instead, in order for Butters to get this case before a jury, she has to present facts from which that jury could find JMU acted in a manner that was clearly unreasonable. And for all the reasons already explained, no reasonable jury could find that JMU's response was clearly unreasonable so as to constitute deliberate indifference under Title IX.

## III. CONCLUSION

For the foregoing reasons, the court will grant JMU's motion for summary judgment and dismiss this case from the active docket of the court. A separate order will be entered.

Entered: September 22, 2016.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge